# United States Court of Appeals
## For the First Circuit

---

No. 21-1281

Deon Fincher,

Plaintiff, Appellant,

v.

Town of Brookline,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

---

Before

Kayatta, Lipez, and Gelpí, Circuit Judges.

---

Brooks A. Ames, with whom Brookline Justice League was on
brief, for appellant.
Joseph A. Padolsky, with whom Patricia Correa and Douglas I.
Louison were on brief, for appellee.

---

February 18, 2022

---

GELPÍ, **Circuit Judge**.  Plaintiff-Appellant Deon Fincher
("Fincher") appeals the district court's grant of summary judgment
to Defendant-Appellee, the Town of Brookline, Massachusetts ("the
Town" or "Brookline") on his claim pursuant to 42 U.S.C. § 1983
for discrimination on the basis of race in violation of the Equal
Protection Clause of the Fourteenth Amendment.  We conclude that
the grant of summary judgment was proper and correspondingly affirm
the decision of the district court.

## I. Background

## A. Facts

We begin by summarizing the relevant facts related to
Fincher's employment with the Town.  Fincher was employed by
Brookline in the Department of Public Works ("DPW") beginning in
September of 2009 when he was hired as a Laborer.  The Town
described the Laborer job as a nonskilled, entry-level position
within the DPW.  There are five divisions within the DPW:
Administration, Engineering and Transportation, Highway and
Sanitation, Parks and Open Space, and Water and Sewer.  Fincher's
employment at all relevant times was within the Highway and
Sanitation Division.  He worked in Sanitation for most of his
employment with the Town.  During his employment, Fincher was one
of only two Black employees in the Highway and Sanitation Division,
out of approximately seventy total employees.

The Sanitation division's primary role is to collect garbage and other waste from fixed routes in Brookline. The Laborer position required the ability to lift and move items weighing up to 100 pounds, although the need to lift items that heavy was infrequent. Laborers were, as a matter of course, required to lift thirty to fifty pounds easily. In order to advance within the Sanitation division, it was necessary to obtain a Commercial Driver's License ("CDL"), which allowed employees to drive large trucks, such as the garbage truck, also called a packer truck. Each packer truck had a driver paired with a "packer" on the back of the truck. The packer's job was to pick up barrels and throw trash into the truck along the route, while the driver drove the truck and assisted the packer in throwing trash when possible. Though Motor Equipment Operator-2s ("MEO-2s") were primarily assigned as packers, Laborers were assigned to the packer position as needed when MEO-2s were not available because the division was short-staffed or the MEO-2s were needed elsewhere.

Fincher did not have a CDL while working for the Town and did not attempt to obtain one. Therefore, he remained classified as a Laborer throughout his period of employment. It was generally understood that the Laborer position required "[s]trenuous physical effort" and it was advertised as such.

Fincher suffered a series of work-related injuries to his right shoulder while working as a Laborer within the Sanitation

- 3 -

division, caused by repeatedly throwing heavy barrels of trash. On November 30, 2009, he injured his right shoulder and went on worker's compensation leave effective December 1, 2009. An Occupational Health Nurse at New England Baptist Hospital[1] ("Baptist Health") cleared him to return to work without restrictions on July 13, 2010. On May 31, 2011, he again injured his right shoulder while working. Following an evaluation at Baptist Health, his Occupational Health Nurse recommended that he return to work with restrictions on April 2, 2012. The recommended restrictions included not lifting over fifty pounds and limiting such work to six hours per day. Fincher returned to work temporarily and was given less strenuous tasks, such as sweeping and cleaning the yard.

On April 6, 2012, Andrew Pappastergion, the Commissioner of Public Works for the Town, informed Fincher via letter that he was being placed on short-term leave as the Town was unable to accommodate a six-hour workday and a long-term leave was not a reasonable accommodation. Effective May 21, 2012, Baptist Health approved Fincher to return to work without restrictions. A few months later, on November 13, 2012, Fincher returned to Baptist Health for continued pain in his right shoulder, caused by repeatedly picking up trash barrels. Baptist Health recommended

---

[1] All Brookline employees were evaluated for work-related injuries at the New England Baptist Hospital.

that he return to work with restrictions, and Fincher was
instructed to alternate work tasks to avoid repetitive lifting and
throwing with his right arm.

Fincher visited Baptist Health on March 1, 2013, again
complaining of pain in his right shoulder.  He was allowed to
return to work with one week of restrictions that limited his
lifting, pushing, and pulling capacity to no more than thirty
pounds.  On March 22, 2013, he returned to Baptist Health and was
given another restriction prohibiting him from lifting more than
thirty pounds for the next seven to ten days.  However, Fincher
never returned to work for the Town and instead went out on
worker's compensation leave again.  On July 26, 2013, Fincher was
again evaluated at Baptist Health.  At that appointment, Fincher
was given work restrictions that were characterized as "likely
permanent for the foreseeable future."  These restrictions limited
Fincher to lifting, pushing, and pulling weight up to thirty pounds
with his right arm, and limited him throwing trash to three to
four days per week.

On June 4, 2014, Fincher applied to the Brookline
Retirement Board for accidental disability retirement benefits
based on his continuing shoulder injuries.  In his application,
Fincher stated that he was no longer able to perform the essential
duties of a Laborer due to the injury to his right shoulder.  His
application was accompanied by a doctor's report which recommended

that he limit pushing, pulling, and lifting with his dominant arm to weights of fifteen pounds or less, limit reaching overhead, and take required periods of rest several days a week.

On June 27, 2014, Commissioner Pappastergion sent Fincher a letter requesting that he attend a meeting to determine whether he could continue performing his job duties with a reasonable accommodation. Fincher's attorney responded by letter that Fincher had a pending application for accidental disability retirement benefits and therefore the meeting would not be necessary.

On April 7, 2015, Commissioner Pappastergion sent Fincher another letter requesting that he attend a reasonable accommodation meeting. The meeting was rescheduled various times until it eventually took place on May 12, 2015. Following the meeting, on that same day, Commissioner Pappastergion sent Fincher a letter terminating his employment effective May 13, 2015 because he found that Fincher was no longer able to perform the essential functions of his job, with or without a reasonable accommodation. On October 18, 2016, Fincher's accidental disability retirement benefits were approved and issued with a retroactive retirement date of April 9, 2015 -- prior to his effective termination.

**B. Procedural History**

Fincher brought this action in the District of Massachusetts on May 9, 2018, alleging a single cause of action:

- 6 -

that Brookline violated his Fourteenth Amendment equal protection rights, and the harm he suffered entitled him to seek relief from the Town pursuant to 42 U.S.C. § 1983.  The Town moved for summary judgment, and the district court granted the motion.  This appeal followed.

## II. **Discussion**

Fincher claims that the Town's repeated refusal to accommodate his disability-related work restrictions -- despite accommodating the work restrictions of other, white employees -- was motivated by racial animus in violation of the Fourteenth Amendment.  According to Fincher, his termination was merely the final act in a long series of racially motivated non-accommodative behavior.  The Town objects to Fincher's allegations of racial discrimination, and also argues that the only potentially actionable event within the statute of limitations is Fincher's May 2015 termination.

We first discuss whether Fincher's challenges to the Town's pre-termination actions are barred by the statute of limitations and to what extent we can consider those actions.  We then consider whether the Town violated Fincher's rights under the Equal Protection Clause by singling him out for disparate treatment.  We note at the outset that Fincher did not bring a claim under either Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e et seq. ("Title VII") or the Americans with
Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA").

## A. Standard of Review

We review a district court's grant of summary judgment
de novo, "drawing all reasonable inferences in favor of the
nonmoving party," Fincher. Kuperman v. Wrenn, 645 F.3d 69, 73
(1st Cir. 2011). Summary judgment is proper if the movant, the
Town, "shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).

## B. Section 1983 Claim and Statute of Limitations

Fincher's claim was properly brought pursuant to 42
U.S.C. § 1983, which allows individuals to "sue certain persons
for depriving them of federally assured rights" under color of
state law. See Gagliardi v. Sullivan, 513 F.3d 301, 306 (1st Cir.
2008). The Town of Brookline as a municipal defendant is
considered a person under § 1983. See Rodríguez v. Municipality
of San Juan, 659 F.3d 168, 172 n.2 (1st Cir. 2011) (citing Monell
v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978)). Therefore, it
"may be held liable under § 1983 for actions taken pursuant to an
official policy or an official custom that violated the
Constitution." See Walden v. City of Providence, 596 F.3d 38, 55
(1st Cir. 2010) (citing Monell, 436 U.S. at 694). One way in which
a plaintiff can establish an official policy or custom is by

showing that "a person with final policymaking authority" caused the alleged constitutional injury.  Rodríguez, 659 F.3d at 181 (quoting Welch v. Ciampa, 542 F.3d 927, 941 (1st Cir. 2008)).  A plaintiff may also show an "unconstitutional municipal custom . . . so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989).

The basis for § 1983 liability does not seem to be seriously disputed by the parties, so we need not delve deeply into it.  Here, Fincher's treatment by the Town and his eventual termination form the basis of his § 1983 claim.  Commissioner Pappastergion, as Commissioner of Public Works, supervises, manages, and controls the DPW.  He also has final policymaking authority, and effectuated Fincher's termination.  Therefore, we conclude the claim was properly brought pursuant to 42 U.S.C. § 1983.

The parties agree about the length of the statute of limitations but disagree about which actions taken by the Town fall within it.  The magistrate judge's report and recommendation, adopted in full by the district court, did not analyze the statute of limitations issue, finding that it made no difference to Fincher's § 1983 claim. As is our prerogative upon de novo review, we choose to put a finer point on that issue.

Section 1983 "borrows the appropriate state law governing limitations unless contrary to federal law." Poy v. Boutselis, 352 F.3d 479, 483 (1st Cir. 2003). "The limitation period applicable to a [§] 1983 claim is to be found in the general personal injury statute of the jurisdiction in which the claim arises." Gilbert v. City of Cambridge, 932 F.2d 51, 57 (1st Cir. 1991) (citing Owens v. Okure, 488 U.S. 235, 249-50 (1989)). The statute of limitations for tort claims under Massachusetts law is three years. Mass. Gen. Laws ch. 260, § 2A. Although state law controls the length of the statute of limitations, federal law controls when the cause of action accrues. Poy, 352 F.3d at 483. "[A] § 1983 claim accrues when a plaintiff knows or has reason to know of his injury." Id.

Fincher argues, and we agree, that we may consider the Town's actions toward him throughout his employment, culminating in his eventual termination, as part of an alleged ongoing pattern of discrimination. Under the continuing violation doctrine, a plaintiff may incorporate otherwise time-barred allegations into his claim if they "are part of the same unlawful employment practice and at least one act falls within the time period." Ayala-Sepúlveda v. Municipality of San Germán, 671 F.3d 24, 30 (1st Cir. 2012) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002)). Here, at least one act falls within the three-year time period (Fincher's termination) and Fincher alleges

this is part of the same unlawful employment practice as the Town's earlier actions (racial discrimination in connection with his injuries and job assignments).  Therefore, under the continuing violation doctrine, we may consider the Town's actions throughout Fincher's employment and culminating in his termination.[2]

## C. **Equal Protection Claim**

### 1. **Comparator Evidence**

To prevail on a claim of racial discrimination in violation of the Equal Protection Clause, at least in the absence of direct proof that racial animus caused the adverse action, a plaintiff must establish (1) that he was selected for adverse treatment compared with others similarly situated, and (2) that the selection for adverse treatment was based on an impermissible consideration, such as his race.  See Alston v. Town of Brookline, 997 F.3d 23, 41 (1st Cir. 2021); Rubinovitz v. Rogato, 60 F.3d 906, 909-10 (1st Cir. 1995); Dartmouth Rev. v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989), overruled on other grounds by Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61 (1st Cir. 2004).  To prove discrimination, a plaintiff can "identify and relate specific instances where persons situated

---

[2] Consistent with Supreme Court precedent on analogous Title VII employment discrimination issues, to the extent that the Town's pre-termination actions formed the basis of Fincher's termination, we may also consider them "as background evidence in support of a timely claim," though they are not independently actionable. Morgan, 536 U.S. at 113.

similarly 'in all relevant aspects' were treated differently." Dartmouth Rev., 889 F.2d at 19 (quoting Smith v. Monsanto Chem. Co., 770 F.2d 719, 723 (8th Cir. 1985)). These relevant aspects include job "performance, qualifications and conduct, 'without such differentiating or mitigating circumstances that would distinguish' their situations." Smith v. Stratus Comput. Inc., 40 F.3d 11, 17 (1st Cir. 1994) (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)). A court can grant summary judgment when "it is clear that no reasonable jury could find the similarly situated prong met." Cordi-Allen v. Conlon, 494 F.3d 245, 252 (1st Cir. 2007) (quoting Harlen Assocs. v. Incorporated Village of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001)).

Fincher's equal protection theory is that the Town discriminated against him on the basis of race by refusing to provide him with a reasonable accommodation for his shoulder injury, culminating in his termination, while simultaneously providing an accommodation to a white employee who was unable to perform his job duties, allowing him to keep his job. More specifically, Fincher argues that the Town discriminated against him by failing to transfer him away from the packer position when it became clear that he could not continue to lift and throw trash with his shoulder injury. On appeal, Fincher proffers one

purported comparator: K.G.,[3] a Caucasian man who also worked in the Sanitation division.[4] Fincher argues that K.G. was similarly situated because he also worked for the Town in the Sanitation division, specifically on the packer truck, and became unable to do his job due to a medical condition. Fincher states that the summary judgment record establishes that K.G. had a drinking problem, which the Town was made aware of after K.G. caused a disturbance at the Town Hall. K.G. then applied for and was granted a transfer off of the packer truck and onto the Highway roster to a position that required a CDL.[5]

---

[3] For purposes of anonymity, this individual will be referred to by initials only.

[4] Fincher raised other comparators before the district court. By not discussing these comparators in his opening brief to this court and only focusing on K.G., he has waived those arguments. See United States v. Mayendía-Blanco, 905 F.3d 26, 32 (1st Cir. 2018). We note that Fincher did mention one other potential comparator, D.M., in his statement of facts before this court. Simply mentioning the comparator in the statement of facts, without more, is not sufficient to save the argument from waiver. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

[5] Fincher states that the record establishes that K.G. was transferred off of the packer truck to a lower-paid position, ostensibly one that he was able to do despite his medical issues, and that this was the accommodation that the Town refused to give Fincher. The record establishes that K.G. applied internally for a transfer, although in his deposition, K.G. did not recall whether the Town assigned him to the new position or whether he requested it.

The Town argues, and the district court agreed, that K.G. and Fincher were not similarly situated because, unlike Fincher, K.G. held a CDL which allowed him to transfer to different, less strenuous positions within the DPW that were not available to Fincher.  We agree with the Town and the district court as to this issue.  There is no evidence in the record to the effect that Fincher was singled out for adverse treatment throughout his employment in comparison with others similarly situated, and no reasonable jury could so find.  The standard for whether a plaintiff and his proposed comparator are similarly situated "is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated."  Mulero-Carrillo v. Román-Hernández, 790 F.3d 99, 106 (1st Cir. 2015) (quoting Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp., 246 F.3d 1, 8 (1st Cir. 2001)).

Fincher fails to meet this standard with his proffered comparator, K.G.  The comparator must be similarly situated "in all relevant aspects."  Dartmouth Rev., 889 F.2d at 19 (quoting Smith, 770 F.2d at 723).  K.G. and Fincher were not.  Fincher's shoulder injury made him physically unable to do his job for the foreseeable future.  K.G.'s possession of a CDL renders his situation different from Fincher's in a critical aspect.  Fincher did not have a CDL and did not attempt to obtain one, preventing

him from being promoted within the DPW. Indeed, Fincher does not identify any position within the DPW that he would have been eligible for transfer to without a CDL. K.G., on the other hand, had a CDL and sought out a transfer to a position that required one. These are the "'differentiating or mitigating circumstances that . . . distinguish' their situations." Smith, 40 F.3d at 17 (quoting Mitchell, 964 F.2d at 583).

Fincher argues that, although K.G. was transferred to a position that required a CDL, he did not use the CDL in his new position. Fincher also attempts to establish that K.G.'s transfer was a cover for a special accommodation because despite applying for a position as a MEO-2, he was assigned to a position as a Highway Craftsman. These facts, however, do not change our determination that both men were not similarly situated because K.G. did not suffer from a physical impairment that prevented him from performing the essential duties of his job. Fincher, on the other hand, did not apply for an internal transfer, nor does he identify any other position that he would have been eligible for without a CDL.

Moreover, Fincher did not establish that the Town treated him adversely in comparison to K.G., which is required under the first prong of the equal protection analysis. K.G. applied internally for his transfer, which he was eligible for because he possessed a CDL. Fincher argues that he "repeatedly

asked to be placed in a position that did not require regular trash-throwing," but he would have been ineligible for such positions because he did not possess a CDL, which was required for advancement within the DPW. The fact that K.G. applied for and was granted a transfer away from the Sanitation division, a transfer for which Fincher was ineligible, does not constitute adverse treatment against Fincher.

Finally, Fincher would also be unable to prove the second prong of the equal protection analysis, that the selection for adverse treatment was based on an impermissible consideration. Instead, the Town's failure to transfer Fincher and Fincher's eventual termination were based on the fact that the Town was unable to reasonably accommodate Fincher's serious injury within the DPW. Indeed, Commissioner Pappastergion and the DPW made multiple attempts to accommodate Fincher's injury as early as April 2012. When he returned to work in April 2012 following an injury, Fincher's supervisor assigned him to light-duty tasks, such as sweeping and raking. In May of 2012, following an injury leave, Fincher was not assigned to Sanitation for approximately ten days, but was instead given other clean-up tasks, such as sweeping and cutting grass. For a two-month period shortly before his final day of work for the Town, Fincher was not assigned to throw trash due to his thirty-pound lifting restriction. On June 27, 2014, while Fincher was on leave, Commissioner Pappastergion requested

that Fincher attend a reasonable accommodation meeting, and Fincher's attorney responded that Fincher had a pending application for accidental disability retirement benefits and therefore the meeting would be unnecessary. Following that, Commissioner Pappastergion convened a meeting on May 12, 2015 to discuss Fincher's possible accommodations. Although Commissioner Pappastergion terminated Fincher's employment following that meeting, it was because he found that Fincher was no longer able to perform the essential functions of his job, with or without reasonable accommodation. The Town's efforts to accommodate Fincher, coupled with Fincher's own desire to pursue accidental disability retirement benefits as opposed to a reasonable accommodation, show a legitimate and nondiscriminatory reason for Fincher's termination.

Therefore, in this case lacking direct proof of discriminatory animus, Fincher cannot prevail using comparator evidence due to his failure to show that he was treated differently than non-Black workers in similar situations. From the evidence in the record, it is clear that no reasonable jury could find the similarly situated prong met. See Cordi-Allen, 494 F.3d at 252.

A final note. The record establishes that Fincher voluntarily requested and was granted accidental disability retirement benefits. The benefits were approved on October 18, 2016, and were issued with a retroactive retirement date of April

9, 2015, prior to Fincher's eventual termination on May 13, 2015. In his application for the benefits, Fincher stated that he could no longer throw trash, and that he had been unable to perform the essential duties of his position since March of 2013. This suggests that, contrary to Fincher's argument, lifting and throwing trash was one of the Town's legitimate requirements for the job. It also underscores the fact that the Town did not select and single out Fincher for adverse treatment. Rather, the Town approved the benefits that Fincher himself had sought out in lieu of a reasonable accommodation because he was no longer able to perform the essential duties of the position.

## 2. McDonnell Douglas Framework

On de novo review, Fincher would like us to reverse the summary judgment grant on the basis that the Town's nondiscriminatory reasons for terminating Fincher were pretextual. He points us to evidence in the record of incidents where the Town showed indifference to the rights of racial minorities, which he says could persuade a jury that the reasons the Town ultimately terminated Fincher were rooted in racism.

In so arguing, Fincher urges us to apply the McDonnell Douglas burden-shifting framework to generate an inference of discriminatory animus. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see also White v. Vathally, 732 F.2d 1037, 1039 (1st Cir. 1984) ("Where direct evidence of discriminatory intent is

lacking, we have recognized that the analytical framework for proving discriminatory treatment set out in [McDonnell Douglas] is equally applicable to constitutional and to Title VII claims.").

Even if we were to assume that Fincher could make out a prima facie case, shifting the burden to the Town to articulate a nondiscriminatory explanation for Fincher's treatment, Fincher provides no evidence sufficient to suggest that the Town's explanation is false, much less a pretextual mask for discrimination. He points generally to past incidents in which the Town "arguably show[ed] a callous indifference to the rights of racial minorities (and women)." Although Fincher's briefing to us is not precise on this point, his descriptions of the incidents below seem to indicate that only one of the events concerning alleged race discrimination occurred during Commissioner Pappastergion's tenure and involved the Commissioner. In that incident, Commissioner Pappastergion, however, disciplined the DPW employee involved for his alleged racist conduct. Fincher also points to the proffered testimony of a former coworker, which Fincher says would "establish the prevalence of racist attitudes within the department." Although the coworker described troubling allegations of racism, the same do not involve Commissioner Pappastergion or any purposeful failure to act on his behalf. Accordingly, Fincher's evidence fails to convince us that the Town's proffered reasons for failing to accommodate and then

dismissing Fincher were a pretext for race discrimination.  Our analysis ends there.

## III. **Conclusion**

      Accordingly, we AFFIRM the judgment of the district court and uphold the grant of summary judgment to the Town of Brookline.  The decision is

**AFFIRMED.**